(Decided January 31st, 1895.)

---

# THE NATIONAL UNION BANK OF MARYLAND *vs.* THE NATIONAL MECHANICS' BANK OF BALTIMORE, ET AL.*

*Assignment for Benefit of Creditors—Right of Creditor Holding Collateral Security—Partnership Real Estate—Creditor of Individual Member of Firm—Private Understanding of Partners as to Real Estate—Statute of Frauds—Estoppel.*

Where an assignment for the benefit of creditors has been made, a creditor who holds collateral security for the debt due him is not entitled to demand from the trustee a dividend on the whole amount of his claim without deducting therefrom the value of such collateral security.

A creditor who has sold the collateral held by him, after the assignment and before distribution by the trustee, is required to credit his claim with the net proceeds of such sale, and is only entitled to a dividend on the balance remaining due.

And if in such case the creditor does not sell the security held by him, the value thereof should be ascertained by proof and credited on his claim before distribution is made.

When the assignment has been made by a firm, a party who is both a creditor of the firm and of the individual members is not estopped to claim that certain real estate is individual and not firm property, because he recommended to the Court the ratification of the sale of

---

* With this case, as reprinted in 27 L. R. A., is a collection of authorities on the question when real estate is partnership property.

such real estate, when the person claiming such estoppel had induced the creditor to sign the recommendation by an assurance that his claim, then filed against the real estate as individual property, would not be affected.

When at the time a partnership was formed certain real estate was the individual property of the members, and nothing was afterwards done to transfer the same to the firm, except the making of entries in the firm books, by which the real estate was treated as firm property, and the fact that the copartners so considered it, then the proceeds of the sale of such real estate will not be treated in equity as partnership assets, when the question arises between the creditors of the firm and those of the individual members.

In such case, persons dealing with the members of the firm have the right, in the absence of notice to the contrary, to assume that the public records inform them correctly as to the ownership of the property, and are not bound by the private understanding between the partners themselves.

But if the real estate was such as was necessary for the convenient conduct of the business, was put into the business as part of the common stock and treated by the partners as partnership property, and was so entered on the firm books as to comply with the Statute of Frauds, then the partnership creditors should have priority over the creditors of the individual partners in the distribution of the proceeds of the sale of such property, provided the real estate was so used as to give notice to the latter that it was treated as partnership property.

Where real estate is purchased with partnership funds, for the use of the firm, it would be immaterial that the title stood in the names of the individual members, as a Court of Equity would treat it as firm property, and hence it would be liable to the partnership creditors to the exclusion of the individual creditors, until the former are satisfied.

Appeal from a *pro forma* order of the Circuit Court of Baltimore City, distributing a fund among creditors. Under the will of Wm. H. Hoffman, which was admitted to probate in Baltimore County in 1886, the residue of his property, embracing three paper mills, several farms and other real estate in said county, was devised to his four children, Lydia A. Smyser, Geo. W. S. Hoffman, W. E. Hoffman, and John W. Hoffman, and one-twentieth of the testator's estate was given to his son-in-law, P. Vondersmith. Subsequently Vondersmith and L. A. Smyser conveyed their interest in said property to Geo. W. S., W. E.

and John W. Hoffman, as individuals, and said property was by them mortgaged to Mrs. Smyser.

Prior to the death of the testator, he, with his said three sons, were engaged in business under the firm name of Wm. H. Hoffman & Sons, and after his death his sons continued the business, using the same firm name. They then opened on their firm books an account headed "Real Estate," in which they entered all the property acquired by them under the will of their father, and continued the same on the books until the assignment hereinafter mentioned. The agreed statement of facts in the record set forth, "that between the said three sons all the said real estate was always consid-ered in their business as copartnership property, and was treated between themselves as such, but that the title to the same appeared in the Land Records of Baltimore County, and in the office of the Register of Wills of Baltimore County, as having been derived by them under the will of their said father and the conveyances of said Vondersmith and Smyser, and no conveyance was made by them to the said partnership."

On October 27, 1893, the said Geo. W. S., W. E. and John W. Hoffman, partners, trading as Wm. H. Hoffman & Sons (their wives uniting), executed an assignment for the benefit of creditors to John B. Ramsay and S. P. Schott of all and singular the real and personal estate   *   * and all the other property of every nature and description of the said copartners, and all the separate estate of each of them, in trust for the payment of partnership and individual creditors, according to their respective right and interest therein. At a meeting of creditors, at which the deed of trust was determined upon, the said firm exhibited a balance sheet of their liabilities and assets, showing among their assets the following item: " Real estate account, $164,600.".

Upon the petition of the trustees under the assignment, the Circuit Court of Baltimore City assumed jurisdiction of the trust, and the usual notice to creditors was given. After

a part of the real estate had been sold, John B. Ramsay, one of the trustees, reported to the Court a private sale of the remaining part of the real estate, while the other trustee filed exceptions, stating that he was hopeful of being able in time to obtain a better price for the property than that reported.   In order to obtain the concurrence of other creditors, Mr. Ramsay explained to the officers of the Union Bank that by the proposed sale the creditors of W. H. Hoffman & Sons would obtain about 33⅓ per cent. of their claims, and the said officers were told that their concurrence would not affect the claim of the Union Bank, but meant only an assent to the sale at the proposed price. Nothing was said as to claims against the real estate as individual or firm property; the Union Bank assented, and the sale was finally ratified.

The Union Bank's claim was upon two promissory notes, each for $5,000, made by W. H. Hoffman & Sons, and endorsed by Geo. W. S. Hoffman, J. W. Hoffman and J. W. Hoffman, treasurer.   As collateral security for each note, Hoffman & Sons had deposited with the bank bonds of the Gunpowder Valley R. R. Co. of the face value of $7,500.   The claim of the Union Bank was filed prior to any sale, against both the partnership and Geo. W. S. and J. W. Hoffman, endorsers on the notes.

The Union Bank excepted to the ratification of the Auditor's account distributing the trust fund, because the real estate in question was treated as partnership property; whereas, this exceptant alleged that it should have been allowed the full amount of its claim out of the proceeds of the sale of the real estate, because such real estate was owned by G. W. S. and J. W. Hoffman, individually, and they were individually liable to the exceptant as endorsers.   The Mechanics' Bank excepted to the account, because, upon the claim of the Union Bank, no credit was given for the collateral security held by the latter; and, answering the above mentioned exception, alleged that the firm creditors were induced to acquiesce in the sale of

the real estate, because the action of the Union Bank led them to believe that the proceeds of sale would be distributed as partnership assets, and that the Union Bank could not then claim that such proceeds should be treated otherwise.

A *pro forma* order of the Court below overruled the exceptions filed by the Union Bank, and sustained the exceptions filed by the Mechanics' Bank and others.

The cause was argued before ROBINSON, C. J., BRYAN, McSHERRY, FOWLER, BRISCOE and BOYD, JJ.

*John N. Steele* and *William H. Buckler* (with whom were *John E. Semmes* and *Francis K. Carey* on the brief), for the appellant.

The questions presented by this appeal are as follows : (1.) Is the Union Bank entitled to receive a dividend on the full amount of its claim, or should it be required to sell the bonds it held as collateral for the notes, apply the proceeds in payment thereof and file its claim only for the balance ?   (2.) Is the Union Bank estopped by its concurrence in the sale, as set out in the record, from now claiming that the real estate was not partnership property ?   (3.) If the Union Bank is not so estopped, was the said real estate partnership property, as against the individual or separate creditors of the members of the firm of Wm. H. Hoffman & Sons ?

1. The appellant is entitled to receive a dividend on the full amount of its claim.   While formerly some doubt existed as to whether the rule in bankruptcy—that the creditor was required to exhaust his security, and was only entitled to prove for the residue—did not also apply to the administration of an insolvent estate, the law would now seem to be well settled that the bankrupt rule does not apply and that the creditor is entitled to prove for the full amount of his claim, irrespective of any collateral security he may hold. *Bisph. Eq.*, sec. 343 ; *West* v. *Bank of Rutland*, 19 Verm.

403; *Brough's Estate*, 21 P. F. Smith, 460; *Findlay* v. *Hosmer*, 2 Conn. 350; *Shunk's Appeal*, 2 Barr. 304; *Blair & Shenk's Appeal*, 1 Norris (Pa.) 113, 116.

2. The concurrence of the appellant in the sale reported May 1st, 1894, does not estop it from now claiming that the real estate so sold was, so far as it is concerned, individual or separate, and not partnership property. *Hardy* v. *Chesapeake. Bank*, 51 Md. 589.

3. The real estate derived by George W. S., W. E. and John W. Hoffman, under the will of their father, and sold by the trustees, belonged to and was held by them as tenants in common, and was not partnership property, and the proceeds of said sale should be first applied to the payment of their separate creditors. The property was not devised to the executors, but they were directed to have the property appraised by three disinterested persons, and the properties specifically devised to his three sons, therefore, vested in them, subject only to the contingency that the properties so devised should not respectively exceed in value one-fourth of the testator's estate, and that they might be charged with the annuity given to his wife. Of this, however, there is no evidence, and it is fair to assume, as the will assumes, that the estate was ample to provide for the annuity, without requiring any contribution from the properties specifically devised.

Shortly after their father's death, the three sons, deriving title to the various properties as above stated, "continued so to trade, using in their business the firm name as aforesaid." There were no written articles of copartnership, and so far as the record discloses, there was no distinct oral agreement. They seemed simply to have *continued* to trade as they had been doing in their father's lifetime. They at once opened on their firm books an account headed "Real Estate," in which they entered all the property derived by them as aforesaid, and continued the same on their books in that way. There was no deed of the property made by the sons to the partnership; nor any deed made by them as

copartners, but they did, as individuals, execute two or more mortgages to Mrs. Smyser; and Peter Vondersmith and Mrs. Smyser conveyed their respective interests in the father's property to the sons, as individuals, and not as partners ; and while the agreed statement recites that between the three sons the said property was considered copartnership property, and was treated between themselves as such, the only thing done by them is the entry made upon the firm books.

There is no question here of the purchase of property with the funds of the partnership for partnership purposes, but simply the question whether the entry on the firm books and the carrying on of the business on certain portions of the property are sufficient to convert individual into partnership property, as against individual creditors.

The doctrine that real estate purchased with partnership funds for partnership uses is, in equity, held to be partnership property, even if the title was put in the names of the partners as tenants in common, has its whole foundation in the fact that partnership funds, which were applicable to the payment of partnership creditors, furnished the consideration, and that equity will therefore raise a trust in favor of such creditors. And it would seem to be well settled, that " in the absence of proof of its purchase with partnership funds, for partnership purposes, real property, standing in the names of several persons, is deemed to be held by them as joint tenants, or as tenants in common;" and to make such property partnership property, it must appear that it was purchased with partnership funds, for partnership purposes. *Thompson* v. *Bowman,* 6 Wall. 316, 317 ; *Shanks* v. *Klein,* 104 U. S. 18 ; *Hammond* v. *Hopkins,* 143 U. S. 269 ; *Frink* v. *Branch,* 16 Conn. 260 ; *Hatchett* v. *Blanton,* 72 Ala. 423 ; *Alexander* v. *Kimbro,* 49 Miss. 529 ; *Richards* v. *Manton,* 101 Mass. 482 ; *Fall River Co.* v. *Borden,* 10 Cush. 460 ; *Chamberlin* v. *Chamberlin,* 44 N. Y. (Sup. Ct.) 116, 121, 123 ; *Pepper* v. *Pepper,* 24 Ill. App. 319 ; *Uhler* v. *Semple,* 5 C. E. Gr. 289 ; *Grubb's Appeal,* 66 Pa. St.

118 ; *Harrison* v. *Richter*, 3 Stock. 389 ; *Baldwin* v. *John-son*, — Sax. 441 ; *Hiscock* v. *Phelps*, 49 N. Y. 97 ; *Fairchild* v. *Fairchild*, 64 N. Y. 471 ; *Hardy* v. *Norfolk Mfg. Co.*, 80 Va. 404 ; *Paige* v. *Paige*, 71 Iowa, 318 ; *Messer* v. *Messer*, 59 N. H. 375 ; *Parker* v. *Bowles*, 57 N. H. 491.

The mere fact that parties carry on their business upon property owned by them as tenants in common, does not give it the character of partnership property, nor raise any presumption to that effect. *Buck* v. *Winn*, 11 B. Mon. (Ky.) 320 ; *Theriot* v. *Michel*, 28 La. An. 109 ; *Balmain* v. *Shore*, 9 Ves. 506, and cases above cited.

Even where real estate has been devised to partners as joint tenants, or as tenants in common, it will not be held to be converted into partnership assets. *Norris* v. *Barrett*, 3 Y. & J. 384 ; *Brown* v. *Oakshot*, 24 Beav. 254 ; *Steward* v. *Blakeway*, L. R. 4 Ch. 608 ; *Phillips* v. *Phillips*, Bisset *on Partn'p*, page 50. An examination of the cases that might at first be thought to be opposed to the principle just stated, will disclose that the decisions were founded on the fact that the real estate was absolutely indispensable to the business of the partnership. The case of *Waterer* v. *Waterer*, L. R. 15 Eq. 402, was a case where the land was held to be partnership property, because (1) the third son's share was purchased as partnership property, and (2) in the nursery business the land cannot be separated from the stock in trade.

If the real estate vested in the members of the firm by devise or descent, or if it was purchased with their individual means, then it can only become partnership property by an *express agreement in writing signed by the partners*. *Alexander* v. *Kimbro*, 49 Miss. 538 ; *Parker* v. *Bowles*, 57 N. H. 491, 496 ; *Otis* v. *Sill*, 8 Barb. 102, 122 ; *Bailey* v. *Hemenway*, 147 Mass. 326 ; *Benton* v. *Roberts*, 4 La. Ann. 216 ; *Bird* v. *Morrison*, 12 Wis. 138 ; *Ridgway's Appeal*, 3 Harris, 177 ; *Kepler* v. *Erie Dime Savings Bank*, 101 Pa. St. 602 ; *Holt's Appeal*, 98 Pa. St. 257. And the agreement should be recorded. *Hale* v. *Henrie*, 2 Watts,

193 ; *Kramer* v. *Ortman,* 7 Barr. 170 ; *McDermot* v. *Lawrence,* 7 S. & R. 438.

The only cases in this State which seem to have any bearing on the appellant's third proposition, are: *Goodburn* v. *Stevens,* 5 Gill 1 ; *Ebert's Exrs.* v. *Ebert's Admrs.,* 5 Md. 357 ; *Citizens' Fire Ins. Co.* v. *Doll,* 35 Md. 105 ; *Rust* v. *Chisolm,* 57 Md. 381.

The Statute of Frauds is in force in this State, and therefore the cases holding that to convert individual into partnership property, there must be an express agreement in writing signed by the partner in whose name the title stands, should in the absence of a decision by this Court, be of controlling authority.   See also *Maccubbin* v. *Cromwell,* 7 G. & J. 163, 164 ; *Carson & Vickery* v. *Phelps et al.,* 40 Md. 99.

The Maryland Code, Art. 21, sec. 1, provides that : "No estate of inheritance or freehold, or any declaration or any limitation of use, or any estate above seven years, shall pass or take effect unless the deed conveying the same shall be executed, acknowledged and recorded as herein provided," and it is respectfully submitted, therefore, that this Court should adopt the rule of the Pennsylvania Courts, and require declarations of trust to be not only in writing, but to be recorded, in order for them to be effectual against " strangers, purchasers, mortgagees and creditors."   It is believed that all the cases concede, that even where the title to real estate, purchased with partnership funds and for partnership purposes, is taken in the name of one of the partners, a *bona fide* purchaser of such property from the party in whose name the property stands, for value and without notice, would acquire a good title.   Now, it is established by the decisions of this Court, that where property is mortgaged and the mortgage is not recorded within six months from its date, the mortgagee will be postponed to those creditors of the mortgagor, who become such after its date and without actual notice.   *Nally* v. *Long,* 56 Md. 571 ; *Stanhope & Co.* v. *Dodge,* 52 Md. 494 ; *Pfeaff* v.

*Jones et al.,* 50 Md. 273; *Sixth Ward Build. Asso.* v. *Wilson,* 41 Md. 515.

*Randolph Barton* and *William Reynolds* (with whom was *Skipwith Wilmer* on the brief), for the appellees.

It was the duty of the Auditor to have ascertained the actual value of his collaterals and to have deducted this from the amount of the notes, and to have audited to the appellant a dividend upon the balance only. Such was the practice under the *U. S. Bankrupt Act of 1867.* See form No. 21, Proof of Debt with Security. Also the following cases: *In re Bridgman,* 1 B. R. 312; *In re Bigelow,* 1 B. R. 632; S. C. 2 Ben. 480.

This practice of valuing securities appears to have had its origin in the English rule in bankruptcy cases, as stated by Lord Eldon, *ex parte Smith,* 2 Rose 63. But Sir John Leach, M. R., in the case of *Greenwood* v. *Taylor,* 1 Russ & M. 185, says that "it is not founded as has been argued upon the peculiar jurisdiction in bankruptcy, but rests upon the general principles of a Court of Equity in the administration of assets." The same practice has been adopted in Massachusetts. *Amory* v. *Francis,* 16 Mass. 308; *Farnum* v. *Boutelle,* 13 Metc. 159; *Middlesex Bank* v. *Minot,* 4 Metc. 325; *Trustee of Haverhill, &c.* v. *Cronin,* 4 Allen 141; so also in New Jersey; *Bell* v. *Fleming,* 1 Beas. 13, 25.

The real estate, under the circumstances of this case, should be treated as partnership property. *Lindley on Part.,* 643, 649; *Waterer* v. *Waterer,* L. R. 15 Eq. 402; *Robinson* v. *Ashton,* L. R. 20 Eq. 25; 1 *Bates on Part.,* secs. 280, 289; *Roberts* v. *McCarty,* 9 Ind. 16; *Smith* v. *Danvers,* 9 Ind. 16; *Smith* v. *Danvers,* 5 Sanf. 669; *Clark's Appeal,* 72 Pa. St. 142; *Osborn* v. *McBride,* 16 Bank. Reg. 22; *Paige* v. *Paige,* 71 Iowa, 318; *Page* v. *Thomas,* 43 Ohio St. 38; *Goodburn* v. *Stevens,* 5 Gill 2; *Shunts* v. *Allen,* 104 U. S. 18.

The appellant is estopped by its conduct from claiming that the real estate should be treated as separate property.

It aided the trustee in bringing in all the creditors by holding out to them a dividend of 33⅓ per cent., which was only derivable by treating the real estate as firm assets. *Pickard* v. *Sears*, 6 Ad. & E. 475; *Butler* v. *Gannon*, 53 Md. 345; *Andrews* v. *Clark*, 72 Md. 434; *Homer* v. *Grosholtz*, 38 Md. 526; *Presstman* v. *Mason*, 68 Md. 89.

BOYD, J., delivered the opinion of the Court.

In October, 1893, George W. S. Hoffman, W. E. Hoffman and John W. Hoffman, partners, trading under the firm name of W. H. Hoffman & Sons, executed a deed of trust, in which their wives joined, to John B. Ramsay and Simon P. Schott, by which they conveyed all their property, "including all of the joint stock of the copartnership and all of the separate estate of each of the partners in trust, for the payment of partnership and individual creditors, according to their respective rights and interest therein."

The Circuit Court of Baltimore City assumed jurisdiction of the trust, and after the sale of the property, which will be more particularly hereafter referred to, an audit was made distributing the proceeds of sales, etc. The appellant held, at the time of the assignment, two notes of the firm, each being for the sum of five thousand dollars, and endorsed by George W. S. Hoffman and J. W. Hoffman, individually. With each note there were deposited bonds of the Gunpowder Valley R. R. Co., of the par value of $7,500.00, as collateral security, with the usual authority to the bank to sell at public or private sale, in case of default. The appellant filed its claim for the amount of the notes, together with costs of protests, against the estates of the firm and of the individual endorsers. The National Mechanics' Bank of Baltimore excepted to the allowance by the Auditor of the claim of appellant, because it had not credited the value of the collateral security held by it, and the appellant excepted to the audit for the reason, as it alleges, that the real estate held and owned by the three members of the firm was their individual property, and not partnership assets.

An agreement was filed in which certain facts are admitted, and the Court below was authorized to pass a *pro forma* order sustaining the exceptions to the claim of the appellant and overruling those filed by it. A *pro forma* order was accordingly passed, and an appeal taken to this Court.

The principal questions presented for our consideration, are :

1st. Is the appellant entitled to a distribution on its whole claim, without crediting the value of the securities held by it as collateral ?

2nd. Is the real estate held by the members of this firm to be treated as partnership or individual property, so far as the appellant is concerned ?

If the appellant had sold the securities held by it between the dates of the assignment and the distribution, there could be no question about the right of the trustees or the creditors to require it to credit its claim with the net proceeds of such sale. The case of *Third National Bank* v. *Lanahan, trustee*, 66 Md. 461, has established that as the law of this State, whatever may be the effect of the decisions elsewhere, cited by the appellant, and it is a just and equitable rule. Such being the case, would there be any equity in permitting the appellant to receive a dividend on its whole claim, simply because it saw proper to delay realizing on its securities until after distribution was made ? We think not. The creditor who holds collateral securities for his claim, has the advantage over other creditors to the extent of their value, or what he may realize upon them, but he should not be permitted to have in addition thereto, what in many cases might be equivalent to double dividends or even more. If, for example, the collaterals realized fifty per centum of the creditor's claim, and the debtor's estate would only pay fifty cents on the dollar, the creditor with the security would be paid in full, whilst the others would receive only one-half of their claims. Great inconvenience and cost would oftentimes follow the practice

contended for in the distribution of insolvent estates, in addition to the undue advantage given the creditor holding the collateral. For if the whole claim be distributed to, and the dividend exceeded the difference between the value of the collaterals and the amount of the claim, the creditor would have to refund or deduct from his dividend the balance, which would require another audit, thus involving the estate in unnecessary cost and delay. The value of the collaterals would have to be ascertained before the dividend was paid to the creditor, so as to properly protect the insolvent estate, for if this be not done and the dividend was more than the difference between the value of the collaterals and the amount of the claim, the trustee would have to look to the creditor holding the collaterals for the excess paid him, and possibly the estate would sustain loss by not being able to recover the amount. The long established practice in proceedings of this kind in this State requires the creditor, in presenting to the Auditor *prima facie* proof of his claim, to swear " that no part of the money intended to be secured by such note hath been received, or any security or satisfaction given for the same, except what (if any) is credited ;" following the language required for authenticating claims in the Orphans' Court. The claim in controversy in this case was supported by the affidavit of the cashier of the bank to the above effect. Such language is not meaningless, but was evidently inserted for the purpose of requiring the creditor either to surrender the securities or credit his claim with their value before it is distributed to.

The value of the securities thus held should be ascertained and credited on the claim before distribution is made. That can be easily done by relevant testimony, taken under authority of the Court, when no sale has taken place. This was the practice in bankruptcy proceedings, and is not without precedent in other Courts. See *In re Bridgman*, 1 B. R. 312 ; *Amory* v. *Francis*, 16 Mass. 308 ; *Farnum* v. *Boutelle*, 13 Metc. 159 ; *First National Bank* v. *Eastern*

*Railroad,* 124 Mass. 524, and *Bell* v. *Fleming,* 1 Beas. 13. There was therefore no error in the *pro forma* decree in regard to that ruling.

In considering the question as to the right of the appellant to have the real estate treated as the individual property of the members of the firm, and not as partnership assets, we must bear in mind the fact that W. H. Hoffman was the original owner of all this property, and that whilst it was thus owned by him he was in partnership with his three sons, trading under the name of William H. Hoffman & Sons, being the style of the firm subsequently adopted by them. If a deed of trust, similar to the one made by the sons, had been made in the lifetime of the father, by the members of the original firm, it would hardly be contended that the real estate should be treated as partnership property—certainly not as against the individual creditors of William H. Hoffman. By his last will and testament the senior Hoffman charged an annuity upon the " Gunpowder Mill " property, for the purpose of keeping a burying ground, etc., in proper condition, and made certain provisions for his wife. He directed his executors to ascertain the value of the rest of his property and gave it, with the exception of one-twentieth thereof left to Peter Vondersmith, his son-in-law, to his three sons and his daughter, Lydia A. Smyser, to be divided between them equally, share and share alike. He directed that in the division his son, John W. Hoffman, should have the property known as the " Gunpowder Mill," chargeable with the annuity aforesaid, together with certain water rights and four hundred acres of land connected therewith, known as " Paper Mill Hills;" also a part of the tract of the land known as " Laurel Hills," one hundred yards wide, on each side of a stream. He also directed that in the distribution his son, George W. S. Hoffman, was to have the " Marble Vale Mill " property, containing 218 acres, and his son, William E. Hoffman, was to have his " Clipper Mill," together with a tract of land called " Grist Mill Hills," containing 257 acres; also a tract

called " Addition to Grant Mill Hills," containing seven and one-quarter acres, and some houses named by him.  He provided that the property thus given to his three sons should be taken by them in the distribution at the prices or values fixed by the appraisers, as provided for in his will, and then directed " that all the rest of my property and estate not hereinbefore devised or specially distributed * * * * shall be sold or disposed of by my said executors * * * * and the proceeds of such sale or sales be so distributed among my said four children as to make the share of each, under these provisions of my will, equal the one to the other."  Subsequently, his son-in-law and his daughter conveyed their respective interests to the three sons " as individuals."

It is admitted in the agreed statement of facts, that after the father died the three sons continued to trade under the firm name of William H. Hoffman & Sons, and opened on their firm books an account headed " Real Estate," in which they entered all the property so derived by them and continued the same on their books in that way ; " that between the said three sons all the said real estate was always considered in their business as copartnership property, and was treated between themselves as such, but that the title to the same appeared in the Land Records of Baltimore County, and in the office of the Register of Wills of Baltimore County, as having been derived by them under the will of their said father, and the conveyances of said Vondersmith and Smyser, as has been hereinbefore stated, and no conveyance was made by them to the said partnership."

It must be conceded that there is nothing on the face of the will that would indicate any intention of the testator to vest the property in his three sons as partners ; but, on the contrary, it is apparent that he intended them to own individually certain properties which he directed to be given them, as above stated.  The property was, at the time the partnership was formed, the individual property of the three members.  So far as the record discloses, nothing has since

been done to transfer the property to the firm or vest any interest in it, excepting the entries in the books and the fact that the real estate was considered in the business as co-partnership property, and so treated between the members, as above stated. We are therefore met with the inquiry, whether that is sufficient to authorize a Court of Equity to treat the proceeds of sale as partnership assets when called upon to decide between the creditors of the firm and those of the individual members.

If this property had been purchased with partnership funds for the use and on account of the firm, it would be immaterial that the title stood in the name of the individual members, as a Court of Equity would treat it for all the purposes of the partnership as firm property, and hence it would be liable to the partnership creditors to the exclusion of the individual creditors until the former are satisfied. In that case there would be an implied or constructive trust in favor of the partners as such, which would inure to the benefit of the creditors of the firm. But when it has been acquired in the manner above stated, the question arises whether those dealing with the members of the firm have not the right, in the absence of some notice or knowledge to the contrary, to assume that the public records inform them correctly as to the ownership of the property, notwithstanding the private understanding between the partners themselves. Creditors have sometimes suffered great hardships by Courts of Equity declaring property standing in the name of one person to be in trust for the benefit of others, but such decisions are rendered to prevent injustice being done those whose money purchased the property, and relief is only granted to them when their claims are established by clear, direct and explicit proof. This Court has said, "This strictness of proof is required because of the danger of rendering titles depending upon deeds and other written documents insecure." *Witts* v. *Horney*, 59 Md. 586.

The same reasoning applies to real estate held of record by members of a firm as tenants in common. When it is

sought to change such property from individual to partnership property, the record evidence all pointing to it being the former, a Court of Equity should not act upon doubtful proof, particularly when the rights of strangers or third parties are to be affected. The public records will be of but little avail, if the private books and intentions of partners are to entirely control and determine the character of ownership of real estate.

If property is purchased with partnership funds, and conveyed to one or more of the partners as individuals, the entries of the firm books would have great, possibly controlling, weight, as to whether it should be treated as partnership or individual property, but Courts should require more than private entries and understandings between partners to overcome the public records in cases such as this. No one would suppose, from reading the will of William H. Hoffman, that the property belonged to the partnership. Persons dealing with the individual members would be led to believe from that will that they owned the property individually, and inasmuch as it was once the separate property of the members, we are not prepared to break down all the safeguards and protection intended by our Registry Acts by announcing as the law of this State that partners can so change the character of real estate, originally owned by them as individuals, and not in any way derived from the partnership, as to give priority to firm creditors over their separate creditors simply by making entries in their books and treating it between themselves as partnership property, without giving some notice or doing some acts equivalent to notice, to their individual creditors. The agreed statement of facts does not show that the appellant had notice of any facts that should have put its officers on inquiry. The statement is not as full as it might have been. It does not even show what business the firm was engaged in, but from the arguments, and what we gather from the record, we assume that they were manufacturing paper. Nor is it definitely stated whether the business was conducted in one or more paper mills, although it is shown

that William H. Hoffman died owning real estate, consisting of three paper mills, farm lands, etc. It would certainly have been much more satisfactory if the facts had been fully set out so as to enable the Court to understand the exact character and extent of the use of the real estate by the firm. But it is admitted that the property was acquired under the will of William H. Hoffman and by the deeds of Mr. Vondersmith and Mrs. Smyser, and that no conveyance was made by the members of the firm to the partnership. As to what uses, if any, this firm engaged in manufacturing paper, made of the farm, dwelling houses and other property not necessarily incident to the paper mills, the record is silent, but it is certain that without some notice that they were treated as partnership property, no one dealing with the individual members of the firm would be expected to so regard it, and the ordinary use of that kind of property, such as cultivating or renting the farms, occupying or renting the houses, &c., would not put creditors on inquiry or be sufficient notice that they were treated as partnership property.

If the paper mills themselves, and such other real estate as would properly be used in connection with them, were treated by the partners as firm property, and were so used as to give notice to creditors of the individual members of the firm that they had been put into the partnership as part of the common stock, and were entered on the books of the firm in such way as to comply with the Statute of Frauds, then the partnership creditors might properly be given priority over the separate creditors to the extent of the proceeds of sales of such property. The record does not disclose such facts as would justify us in determining that question, but as the decree must be reversed, the Court below can authorize testimony to be taken on that subject. We have carefully examined the authorities cited by the counsel for the respective parties, as well as many others, and have found considerable apparent conflict between some of them. But when the facts of them are carefully examined, it will be found that the most

of them are in accord with our conclusion, which might be summarized as follows:

1st. That as the farms, houses and similar property were not purchased with partnership funds, for partnership purposes, but were, as far as the public records show, the separate property of the individual members, and were not incident to the business of the firm, the fact that the partners entered them on the firm books and treated them as firm property is not sufficient to change them into partnership property, and the proceeds of sales of them should be applied to the payment of the claims of individual creditors prior to those of the partnership creditors.

2nd. That if the paper mills, and such other real estate connected therewith as would be necessary for the convenient and proper conduct of the business, were treated by the partners as partnership property, were put into the firm business as part of the common stock, and were so entered in the books of the firm as to comply with the Statute of Frauds, then the partnership creditors should have priority over the general creditors of the individual partners in the distribution of the proceeds of sales of such property; provided this class of property was so used as to give notice to the latter that it was treated as partnership property and was substantially involved in the business of the firm.

There is still another question to be disposed of. It is contended that the appellant is estopped from claiming that the real estate is individual and not partnership property, by reason of its signing a recommendation to the Court to ratify its sale reported May 1st, 1894, by John B. Ramsay, one of the trustees.

Mr. Ramsay and Mr. Schott, the trustees, differed as to the propriety of a sale of the property remaining unsold at the price which had been offered, the latter thinking that in time a better price could be obtained, whilst the former thought it best to sell at once. Mr. Ramsay reported the sale and Mr. Schott was required to show cause why it

should not be made.   The American National Bank, of which Mr. Schott was cashier, was the only creditor opposing the sale, and Mr. Ramsay undertook to secure the concurrence of enough creditors to overcome the opposition of that bank.   Accordingly the National Mechanics' Bank, of which Mr. Ramsay was president, and which was the largest creditor, signified, through its attorneys, who were also attorneys for the trustees, its concurrence in the sale to the officers of the appellant, which was the next largest creditor and sought their consent.   It was explained to them that by the proposed sale the creditors of William H. Hoffman & Sons would get about 33⅓ per cent. of their claims, and it was thought that the concurrence of two such large creditors would influence the others.   The appellant fully understood that the 33⅓ per cent. was to come from the sale of the property mentioned in these proceedings.   The appellant, the Mechanics' Bank, and another creditor, signed a paper requesting the Court to ratify the sale, whereupon Mr. Ramsay sent out a circular letter to the creditors of the firm asking their concurrence in the sale, stating that the proposed sale would pay the creditors about 33⅓ per cent. of their claims, and that these two banks approved of it.   It is admitted that the officers of the Union Bank asked the counsel for the trustees and Mechanics' Bank whether the signing of the concurrence to the sale would affect the claim of the Union Bank, and "were told that it would not, and that it only meant an assent to said sale at the price proposed.   But nothing was said by either side as to the claim against the property as individual or firm property."

We do not think the facts stated in the record are sufficient to estop the appellants.   It is perfectly apparent that the difference between the trustees was as to the price to be obtained for the property—whether the offer received by Mr. Ramsay should be accepted or they should wait for a better price.   There is not a particle of evidence tending to show that the property did not bring its full value, or that

any of the creditors have been injured.   The only creditor that filed objections to the appellant's claim on this ground is the Mechanics' Bank, which had concurred in the sale before the appellant did.   It could not, therefore, claim that it was misled by the act of the appellants.   But before the officers of the appellant signed the recommendation, they inquired of the attorneys representing the Mechanics' Bank and the trustees who were seeking their concurrence, whether it would affect the claim of the Union Bank, and were told it would not.   There can be no question as to what claim was referred to, as the agreed statement shows that "the claim of the Union Bank was filed long prior to any sale against both the partnership and the endorsers of the notes held by the bank."   It would, perhaps, be more equitable to say that the Mechanics' Bank should be estopped from questioning the right of the Union Bank to assert its claim after having induced it to sign the concurrence by the assurance that such act would not affect its claim.   But there is no proof that any creditor was either misled or injured by the action of the appellant, and nothing in the record to justify an inference that such was the case.

This Court, in *Hardy & Brothers* v. *Chesapeake Bank,* 51 Md. 590, in speaking of the doctrine of an estoppel in *pais,* said: "It can therefore only be set up and relied on by a party who has actually been misled to his injury, for if not so misled he can have no ground for the protection that the principle affords."   From what we have already said it can be seen that we think that an application of the above principle of law to the facts of this case disposes of the question of estoppel.   The decree *pro forma* must be reversed and the cause remanded for further proceeding in accordance with this opinion.

*Decree reversed and cause remanded*
*with costs to the appellant.*

(Decided January 31st, 1895.)